# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

PATRICIA A. NELSON,

    Plaintiff,

  v.                                                                            Case No. 20-CV-1878-SCD

KILOLO KIJAKAZI,
**Acting Commissioner of Social Security,**

    Defendant.

## DECISION AND ORDER

      Patricia A. Nelson applied for social security disability benefits based on chronic pain in her lower back, fibromyalgia, and migraine headaches. After a hearing, an administrative law judge denied Nelson's claim, finding she could still perform sit-down jobs if she were allowed to change positions every twenty minutes and had several postural limitations. Nelson seeks judicial review of that decision, arguing that the ALJ erred in finding that her headaches did not result in any functional limitations, providing an impermissibly vague hypothetical during the administrative hearing, failing to consider the mental effects of her physical pain symptoms, failing to assess the results of a functional capacity evaluation, and relying on a list of her daily activities to discount her subjective allegations of disabling symptoms. Kilolo Kijakazi, the Acting Commissioner of the Social Security Administration, contends that the ALJ did not commit reversible error in denying Nelson's claims and that substantial evidence supports his decision. I agree with Nelson: the ALJ committed reversible error in not addressing the functional capacity evaluation contrary to the ALJ's conclusion that Nelson retained the ability to perform sit-down work. Accordingly, I will reverse the decision denying

Nelson disability benefits and remand the matter for further proceedings.

## BACKGROUND

On December 20, 2020, Nelson filed this action seeking judicial review of the final decision of the Commissioner of Social Security denying her claims for disability benefits under the Social Security Act, 42 U.S.C. § 405(g). *See* ECF No. 1. United States District Judge Lynn Adelman reassigned the matter to me after all parties consented to magistrate-judge jurisdiction under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73(b). *See* ECF Nos. 4, 7, 9. Nelson filed a brief in support of her disability claims, ECF No. 23; Kijakazi filed a brief in support of the ALJ's decision, ECF No. 33; and Nelson filed a reply brief, ECF No. 36.

### I. State-Agency Review

In December 2018, Nelson applied for disability insurance benefits and supplemental security income, alleging that she became disabled on October 15, 2017. R. 13, 186–99.[1] She listed several medical conditions on her disability applications: fibromyalgia, moderately degenerative disc between L4-L5 and L5-S1, bulging disc, chronic sinusitis, chronic migraines, anxiety, depression, and mild facet and ligamentum flavum hypertrophy. R. 217. Nelson asserted that she completed two years of college, worked for years in office-type jobs, and was fired from her most recent job in February 2019 for missing too much work due to her physical and mental conditions. *See* R. 218–30.

In March 2019, Nelson completed a function report in support of her disability applications. *See* R. 244–54. She claimed that her fibromyalgia caused constant, daily pain; extreme fatigue; stiffness; restless sleep; anxiety; and difficulty focusing. R. 244. She also claimed to have four to six migraines with nausea and vomiting, to be sick for extended

---

[1] The transcript is filed on the docket at ECF No. 19-2 to ECF No. 19-16.

periods due to chronic sinusitis, and to have bulging discs, narrowing of the spine, and pain in her back. R 244, 253. Nelson estimated that she could pay attention for about five to fifteen minutes before she lost focus, R. 249, and that without a break she could sit for thirty minutes, stand for ten to fifteen minutes, and walk for ten to fifteen minutes, R. 252. Nelson further estimated that, over the course of the workday, she could sit for two to three hours, stand for one hour, and walk for one hour. R. 252. As for her daily activities, Nelson reported that she had some difficulty getting dressed and bathing; she made sandwiches, frozen meals, or leftovers; she tried to do the dishes and laundry but had difficulty standing and finishing those tasks; she could drive; she shopped a couple times a month with her daughter or fiancé; she was able to manage her money; she liked to watch television, read, crochet, and sew; and she visited with her family a few times a month and got a pedicure with her daughter once a month. R. 245–49. Overall, Nelson reported that she didn't know how she'd feel on any given day and that her fiancé helped with many daily tasks. R. 251, 254.

The Social Security Commissioner denied Nelson's applications at the state-agency level of review. *See* R. 64–119. Usama Khayyal, MD, reviewed the medical record initially, and Rohini Mendonca, MD, reviewed the record upon Nelson's request for reconsideration. Both reviewing physicians opined that Nelson had two "severe" medically determinable impairments, a spine disorder and fibromyalgia, R. 70, 81, 94, 109, meaning those impairments significantly limited Nelson's physical or mental ability to do basic work activities, *see* 20 C.F.R. §§ 404.1520(c), 416.920(c). According to the reviewing physicians, Nelson's obesity and migraines were not severe impairments. R. 70, 81, 94, 109. Both reviewing physicians opined that Nelson retained the capacity to work at the medium exertional level with only frequent stooping and climbing ladders, ropes, and scaffolds. R. 72–

3

74, 83–85, 97–100, 112–15. Dr. Mendonca further opined that Nelson could only frequently crawl and should avoid concentrated exposure to noise and vibration. R. 98–99, 113–14.

Robert Barthell, PsyD, and Larry Kravitz, PsyD, reviewed the psychological records at the initial and reconsideration levels, respectively. Dr. Barthell opined that Nelson did not have a medically determinable mental impairment. R. 70–71, 81–82. Dr. Kravitz opined that Nelson had a non-severe depressive disorder. R. 95–96, 110–11. Similarly, Dr. Kravitz opined that Nelson's mental-health impairment was not presumptively disabling because she did not have an extreme limitation of one, or a marked limitation of two, of the four areas of mental functioning a person uses in a work setting (known in social security lexicon as the "paragraph B" criteria): understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing oneself. *Id.*

After the Commissioner denied her applications at the state-agency level, Nelson requested an administrative hearing before an ALJ. R. 137–38.

## II. Administrative Hearing

On August 13, 2020, ALJ Brent Bedwell held an evidentiary hearing on Nelson's disability applications. *See* R. 32–63. Nelson testified at the hearing. *See* R. 39–54. She told the ALJ that she had daily pain and stiffness throughout her entire body; she had difficulty remembering, concentrating, staying on task, and finishing tasks; she struggled with communication; and she had difficulty walking, standing, or sitting for even a short period of time. Nelson also told the ALJ she needed to change positions frequently—within about ten or fifteen minutes of just sitting or standing, or even sooner when doing a task like vacuuming or washing dishes. Nelson stated that she got headaches one to three times per week that produced nausea and vomiting and that could last two to four days. She reported that her

various symptoms persisted despite taking several medications and that they interfered with her ability to perform or complete daily tasks. Overall, Nelson stated, "I never know what I'm going to expect when I wake up in the morning. Some mornings are even hard to get out of bed, whether it's a migraine or full body pain. It's very difficult to function." R. 43.

The ALJ also heard testimony from a vocational expert. *See* R. 54–61. The vocational expert characterized Nelson's past relevant work as two composite jobs: first, an accounting clerk and an administrative clerk (the office manager position at a restaurant); and second, an administrative clerk and a shipping order clerk (the office assistant job at a horn manufacturer). R. 56. The ALJ then asked the vocational expert to consider an individual with Nelson's age (forty-six years old at the time of the hearing), education (an associate degree), and work experience (performing skilled and semi-skilled office work) who could perform a restricted range of sedentary work. Relevant here, the ALJ asked the vocational expert to consider a person who needed to change positions between sitting and standing:

> I want you to assume that if this individual has been standing for 20 minutes, they're going to be permitted to sit down for a few minutes before returning to standing. Similarly, if the person has been sitting for 20 minutes, stand up for a couple of minutes then return to [sitting]. Changing positions at this rate in frequency throughout the work day.

R. 57. According to the vocational expert, that hypothetical person could perform Nelson's past job as an office manager (as she performed it). That person could also work as a "grading clerk," a "sorter," and a "phone solicitor." R. 57–58. The vocational expert indicated that no jobs would be available if the person also required two unscheduled breaks each day, was absent more than once a month on a consistent basis, or was off task at least fifteen percent of the workday.

5

**III. ALJ's Decision**

Applying the standard five-step analysis, *see* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4), on August 27, 2020, the ALJ issued a written decision finding that Nelson was not disabled, *see* R. 10–31. The ALJ determined that Nelson met the insured status requirements of the Social Security Act through December 31, 2023. R. 16. At step one, the ALJ determined that Nelson had not engaged in substantial gainful activity since her alleged onset date. R. 16. The ALJ determined at step two that Nelson had three severe impairments: degenerative disc disease, fibromyalgia, and obesity. R. 16–18. According to the ALJ, Nelson's headaches were not a severe impairment because she "managed [them] conservatively and reported improvement in severity and frequency of headaches with medication therapy." R. 16 (citing Exhibits 3F/32 [R. 361], 13F/100 [R. 690]). For example, the ALJ noted that Nelson "experienced 'excellent acute therapy response' with Imitrex triptan therapy with overall improvement" at a neurology appointment in August 2019. *Id.* Likewise, the ALJ found that Nelson's mental impairments of depression and anxiety were not severe because they did not cause more than a "mild" limitation in any of the paragraph B criteria and the evidence did not otherwise indicate that Nelson had more than a minimal limitation in her ability to do basic mental work activities. R. 17–18. At step three, the ALJ determined that Nelson did not have an impairment, or a combination of impairments, that met or medically equaled the severity of a presumptively disabling impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (i.e., "the listings"). R. 18–19.

The ALJ next assessed Nelson's residual functional capacity—that is, her maximum capabilities despite her limitations, *see* 20 C.F.R. §§ 404.1545(a), 416.945(a). The ALJ found the Nelson had the RFC to perform a restricted range of sedentary work. R. 19. Specifically,

the ALJ determined that Nelson "must be allowed to change positions between sitting and standing every 20 minutes, for a few minutes, before returning to sitting or standing." *Id.* The ALJ also determined that Nelson was unable to climb ladders, ropes, or scaffolds and could only occasionally stoop, crouch, kneel, crawl, and climb ramps and stairs. In assessing that RFC, the ALJ considered Nelson's subjective allegations, the medical evidence, and the medical opinion evidence and prior administrative findings. *See* R. 19–24.

The ALJ determined that the intensity, persistence, and limiting effects of the symptoms Nelson alleged in her disability report, function report, and hearing testimony were not entirely consistent with the other evidence in the record. *See* R. 19–22. The ALJ noted that Nelson was diagnosed with fibromyalgia prior to her alleged onset date and that treatment records documented associated symptoms of chronic stiffness, body aches, radiating pain, fatigue, variable energy, and sleep disturbance. R. 20. The ALJ further noted Nelson's history of degenerative disc disease of the lumbar spine, as evidenced by diagnostic imaging studies, which supported her complaints of chronic low back pain. Finally, the ALJ noted that Nelson was overweight during the relevant period. The ALJ also discussed physical examinations during the relevant period that revealed some abnormalities, including decreased range of motion of the lumbar spine and tenderness to palpation of various areas of the body. According to the ALJ, all the above evidence warranted limiting Nelson to sedentary work with postural limitations and a sit/stand option. R. 22.

However, the ALJ found that Nelson's allegations of disabling symptoms and limitations were not consistent with other evidence in the record. The ALJ discussed medical records demonstrating that, despite experiencing symptoms from her physical impairments, Nelson retained reasonable physical function. R. 20. For example, the ALJ cited records

7

showing no evidence of joint swelling or obvious deformity, intact sensation, full strength, symmetric and normal deep tendon reflexes, normal muscle bulk and tone with no atrophy, normal coordination, normal gait, and a negative straight leg raise. R. 20–21 (citing Exhibits 9F/38–39 [R. 512–13]; 12F/8 [R. 578], 11–12 [R. 581–82]; 13F/47 [R. 637], 119 [R. 709]; 17F/48 [R. 864]; 18F/12 [R. 885]). The ALJ noted similar findings during pain management examinations. R. 21 (citing Exhibit 17F [R. 817–73]).

The ALJ also discussed Nelson's January 2020 neuropsychological evaluation with Julie A. Bobholz, PhD. R. 21 (citing Exhibit 27F [R. 946–53]). According to the ALJ, cognitive testing during that evaluation showed difficulty with a measure of sustained attention and a slight weakness with word finding; otherwise, results were well within normal limits. The ALJ noted that the evaluation did not indicate a neurocognitive impairment. Rather, Dr. Bobholz suggested that Nelson's pain, fatigue, migraines, and sleep and mood issues were likely the cause of her alleged cognitive struggles.

In addition to the "relatively mild objective medical findings noted above," the ALJ found that Nelson's treatment history also was not consistent with her allegations of disabling symptoms and limitations. R. 21–22. The ALJ cited records where Nelson reported improvement in her symptoms with "largely routine" treatment, including medication management. R. 21. For example, Nelson reported that injections she received prior to her alleged onset date helped her pain for a while. R. 21 (citing Exhibit 12F/6 [R. 576]). Treatment notes indicated that Nelson was doing fairly well until February 2019 when she reported twisting her back a few weeks prior. R. 21 (citing Exhibit 9F/37 [R. 511]). Nelson stated that the pain radiating down her leg had resolved and that the pain in general had improved since the initial injury. R. 21 (citing Exhibits 9F/37 [R. 511], 39 [R. 513]). Her provider prescribed

8

an oral steroid, and, a few weeks later, Nelson underwent sacroiliac joint injections. R. 21 (citing Exhibits 9F/39 [R. 513]; 13F/13 [R. 603]). In May 2019, Nelson reported ongoing pain, so her provider prescribed tramadol twice a day and, if absolutely needed, hydrocodone at night. R. 21 (citing Exhibit 12F/9 [R. 579]). The ALJ also noted that Nelson stopped taking gabapentin when providers attributed the medication to Nelson's reported difficulties communicating. (R. 21 (citing Exhibits 13F/41 [R. 631], 70 [R. 660]).

The ALJ also cited records after Nelson began treatment with Advanced Pain Management in June 2019. R. 22 (citing Exhibit 17F/45 [R. 861]). For example, following the initial evaluation, the pain management specialist prescribed various medications and advised Nelson to undergo additional sacroiliac joint injections. R. 22 (citing Exhibit 17F/49 [R. 865]). As of July 2019, Nelson was participating in physical therapy twice a week and receiving chiropractic care. R. 22 (citing Exhibits 13F/116 [R. 706]; 16F [R. 769–816]). She also received another round of injections that month. R. 22 (citing Exhibit 13F/86 [R. 676]). Physical therapy notes from September 2019 indicated that, while Nelson had demonstrated improvements in her symptoms since starting therapy, progress was slow, as expected given the chronic nature of her pain. R. 22 (citing Exhibit 16F/39 [R. 807]). The therapist noted that Nelson's inactivity throughout the day likely resulted in her soreness during therapy. *Id.* In October 2019, Nelson reported to pain management that tramadol worked well but that it didn't last and that she did well with the rare hydrocodone at night. R. 22 (citing Exhibit 17F/4 [R. 820]). Her provider added massage therapy to her treatment regimen. R. 22 (citing Exhibit 17F/5 [R. 821]). Treatment notes from November 2019 indicated that tramadol and Tylenol helped Nelson's pain and that cyclobenzaprine helped with sleep. R. 22 (citing Exhibit 18F/13 [R. 886]).

9

The ALJ also determined that the diagnostic imaging did not reveal abnormalities consistent with Nelson's allegations of disabling pain. R. 22. The ALJ discussed the results of a 2019 MRI of Nelson's lumbar spine, which, like the 2013 MRI, showed only mild degenerative changes and no central canal stenosis. *Id.* (citing Exhibit 13F/49 [R. 639]). The ALJ further noted that the only clinical findings pertaining to fibromyalgia were "tenderness to touch of various locations of the body." R. 22.

Finally, according to the ALJ, "the nature and scope of [Nelson's] reported activities during the relevant period [were] also not consistent with allegations of disabling pain." R. 22. The ALJ noted that, in her function report, Nelson claimed to have difficulty with various activities of daily living. *Id.* (citing Exhibit 5E [R. 242–54]). However, the ALJ noted Nelson also alleged she could perform various personal care tasks without assistance, prepare her own simple meals, do some light housework, leave her home independently, drive, shop in stores with assistance, manage her personal finances, watch television and read daily, and spend time with others. *Id.* In the ALJ's view, Nelson's reported activities demonstrated that, while she experienced symptoms, she "remained able to engage in a range of activities." R. 22.

As for the opinion evidence, the ALJ first considered the opinions of the state-agency reviewing physicians. The ALJ determined that those opinions—limiting Nelson to a restricted range of medium work—were partially persuasive. R. 23. The ALJ credited the reviewing physicians' opinions concerning exertional and postural limitations but found that the opinion about environmental limitations was inconsistent with the evidence, including Nelson's "significant improvement in headaches with new treatment modalities." *Id.* The ALJ also found that more recent medical evidence not considered by the reviewing physicians suggested additional exertional and postural limitations.

The ALJ next considered the opinions of Nelson's primary care provider, Andrea Jo Poulson-Port, MD. On May 24, 2019, Dr. Poulson-Port wrote a letter indicating that Nelson had three restrictions: no bending; no sitting or standing for greater than two hours at a time; and no lifting greater than ten pounds. R. 570. Dr. Poulson-Port wrote another letter on August 19, 2019. *See* R. 717. She noted that Nelson "has had a very difficult time maintaining employment as she cannot sit or stand for longer than a few minutes and has significant fatigue and brain fog as well as her physical pain." *Id.* As support, Dr. Poulson-Port referenced a recent physical therapy assessment where Nelson "had a significant problem with sitting and standing for more than a few minutes; constantly has to shift her position." *Id.* Dr. Poulson-Port opined that Nelson's condition likely would not improve.

The ALJ determined that Dr. Poulson-Port's opinions had "little persuasive value." R. 23. According to the ALJ, those opinions were inconsistent with the objective evidence showing reasonable physical function (e.g., normal gait, strength, and coordination), inconsistent with evidence showing improvement in symptoms with medication, and based on Nelson's subjective complaints during one examination. The ALJ further found that Dr. Poulson-Port's opinion about sitting and standing was inconsistent with Nelson's own report that she could sit for thirty minutes, stand for ten to fifteen minutes, and walk for ten to fifteen minutes without break. *Id.* (citing Exhibit 5E [R. 242–54]). The ALJ explained that his RFC assessment, which permitted Nelson to change positions every twenty minutes, "str[uck] the appropriate balance between [Nelson's] subjective complaints of pain and fatigue and the clinical findings of reasonable physical function." R. 23.

Finally, the ALJ considered the opinions of Nelson's pain management specialist, Jeremy Scarlett, MD. Dr. Scarlett completed a physical medical source statement on

11

November 11, 2019, in which he opined that Nelson could sit for fifteen minutes at a time and about four hours in an eight-hour workday; could stand for ten minutes at a time and about two hours a workday; needed to shift positions during the workday; needed unscheduled breaks every two hours; could frequently lift ten pounds or less, rarely lift twenty pounds, and never lift fifty pounds; and had several postural limitations. R. 887–90. Dr. Scarlett further opined that Nelson's symptoms would interfere with her attention and concentration at least twenty-five percent of the workday and that Nelson likely would be absent more than four days month as a result of her medical conditions or treatment. R. 890–91.

The ALJ determined that Dr. Scarlett's opinions were partially persuasive. R. 23–24. The ALJ agreed that the medical evidence supported Dr. Scarlett's opined limitations to the extent they were consistent with sedentary work. However, the ALJ found that Dr. Scarlett's opinions about off-task behavior and absenteeism were speculative. The ALJ noted that upon examination Nelson demonstrated good concentration and attention, congruent thought processes, normal thought content, and no perceptual problems. R. 43 (citing Exhibits 13F/45–46 [R. 635–36]; 25F/9–10 [R. 936]).

The ALJ then continued with the sequential evaluation process. At step four, the ALJ determined that Nelson could still perform her past job as an office manager (a composite job of accounting clerk and administrative clerk). R. 24. The ALJ alternatively determined at step five that there were jobs that existed in significant numbers in the national economy that Nelson could perform. R. 25–26. Relying on the vocational expert's testimony, the ALJ mentioned three examples: greeting clerk, sorter, and phone solicitor. Based on those findings,

12

the ALJ determined that Nelson was not disabled from her alleged onset date through the date of the decision. R. 26.

The Social Security Administration's Appeals Council denied Nelson's request for review, R. 1–6, making the ALJ's decision a final decision of the Commissioner of the SSA, *see Loveless v. Colvin*, 810 F.3d 502, 506 (7th Cir. 2016).

## APPLICABLE LEGAL STANDARDS

"Judicial review of Administration decisions under the Social Security Act is governed by 42 U.S.C. § 405(g)." *Allord v. Astrue*, 631 F.3d 411, 415 (7th Cir. 2011) (citing *Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010)). Pursuant to sentence four of § 405(g), federal courts have the power to affirm, reverse, or modify the Commissioner's decision, with or without remanding the matter for a rehearing. A reviewing court will reverse a Commissioner's decision "only if the ALJ based the denial of benefits on incorrect legal standards or less than substantial evidence." *Martin v. Saul*, 950 F.3d 369, 373 (7th Cir. 2020) (citing *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000)).

"Substantial evidence is not a demanding requirement. It means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Martin*, 950 F.3d at 373 (quoting *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019)). In reviewing the record, this court "may not re-weigh the evidence or substitute its judgment for that of the ALJ." *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004) (citing *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003)). Rather, I must determine whether the ALJ built an "accurate and logical bridge between the evidence and the result to afford the claimant meaningful judicial review of the administrative findings." *Beardsley v. Colvin*, 758 F.3d 834,

13

837 (7th Cir. 2014) (citing *Blakes v. Barnhart*, 331 F.3d 565, 569 (7th Cir. 2003); *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001)).

## DISCUSSION

Although Nelson contends that the ALJ committed several errors in his decision, I will address only one of those alleged errors because it is significant enough by itself to require remand. Nelson argues that the ALJ committed reversible error when he failed to assess findings from a physical therapy evaluation that reflected functional limitations inconsistent with full-time work.

In July 2019, Nelson presented to Carolyn M. Jansen, PT, for a functional capacity evaluation. *See* R. 728–31. Nelson had requested the referral from Dr. Poulson-Port (her primary care provider) shortly after she applied for social security disability benefits. *See* R. 578. Nelson told Jansen that her chronic pain, which she claimed to have had for twenty-five to thirty years, worsened in the last decade and was affecting her work. R. 729. She stated that she couldn't sit or stand very long, couldn't lift very much, and couldn't walk very far. Objective testing confirmed that Nelson had significant issues sitting, standing, and walking. *See* R. 730. The "positional tolerance" test revealed that Nelson could tolerate sitting only occasionally—meaning up to one-third of the workday—as she had "near constant movement and positional changes to manage pain." R. 730. Likewise, testing revealed that, given her "near constant positional changes to tolerate pain," Nelson could never tolerate standing—that is, she could tolerate standing for brief periods but was unable to sustain for up to one-third of the day. *Id.* And during the walking test, Nelson took standing rest breaks every forty feet and walked with an antalgic gait, leading Jansen to conclude that Nelson could only

14

occasionally tolerate walking. *Id.* Jansen recommended therapy "to improve functional abilities with the above noted limitations and to help manage pain." *Id.*

The ALJ did not directly address the findings of the functional capacity evaluation, but he should have. For a claim, like Nelson's, filed on or after March 27, 2017, the ALJ must consider a medical opinion offered by a medical source, regardless of whether the medical source is an acceptable medical source. *See* 20 C.F.R. §§ 404.1520c, 416.920c. According to social security regulations, a physical therapist like Jansen is a "medical source." *See* 20 C.F.R. §§ 404.1502(d), 416.902(d) ("*Medical source* means an individual who is licensed as a healthcare worker by a State and working within the scope of practice permitted under State or Federal law."). And Jansen's statement about Nelson's ability to sit, stand, and walk during a workday constituted a "medical opinion." *See* 20 C.F.R. §§ 404.1513(a)(2), 416.913(a)(2) ("A medical opinion is a statement from a medical source about what you can still do despite your impairment(s) and whether you have one or more impairment-related limitations or restrictions in the following abilities: . . . sitting, standing, [or] walking.").

Kijakazi argues that the ALJ's failure to expressly address the findings of the functional capacity evaluation was harmless error. Kijakazi notes that the ALJ discussed Nelson's physical therapy records generally. Also, according to Kijakazi, the ALJ implicitly considered the functional capacity evaluation findings when evaluating Dr. Poulson-Port's opinions. Kijakazi further contends that the flexible sit/stand option assessed by the ALJ sufficiently accommodated the sitting and standing limitations noted in the evaluation.

The Seventh Circuit has repeatedly held that administrative error like the one here is subject to harmless-error review and that remand is not required if the reviewing court "can predict with great confidence that the result on remand would be the same." *Schomas v. Colvin*,

15

732 F.3d 702, 707–08 (7th Cir. 2013) (citing *McKinzey v. Astrue*, 641 F.3d 884, 892 (7th Cir. 2011); *Parker v. Astrue*, 597 F.3d 920, 924 (7th Cir. 2010); *Spiva v. Astrue*, 628 F.3d 346, 353 (7th Cir. 2010); *Keys v. Barnhart*, 347 F.3d 990, 994–95 (7th Cir. 2003)). "[T]he harmless error standard is not . . . an exercise in rationalizing the ALJ's decision and substituting [the reviewing court's] own hypothetical explanations for the ALJ's inadequate articulation." *McKinzey*, 641 F.3d at 892. Rather, the question for a reviewing court "is now prospective—can [I] say with great confidence what the ALJ would do on remand—rather than retrospective." *Id.*

Based on my review of the record, I cannot say with great confidence that the ALJ would reach the same result on remand. *First*, the fact that the ALJ cited Nelson's physical therapy records three times in his decision, *see* R. 20 (citing Exhibit 16F [R. 769–816]), R. 22 (citing Exhibits 16F [R. 769–816]; 16F/39 [R. 807]), did not substitute for a discussion of the functional capacity evaluation findings. The therapy records cited by the ALJ did not reference the evaluation findings or include similarly specific functional limitations.

*Second*, the ALJ's brief reference to the functional capacity evaluation findings in the context of Dr. Poulson-Port's opinions was insufficient. The ALJ noted that, in her August 2019 letter, Dr. Poulson-Port indicated that Nelson "cannot sit or stand for longer than a few minutes." R. 23 (citing Exhibit 14F [R. 717–19]). According to the ALJ, Dr. Poulson-Port based that opinion on Nelson's "subjective complaints during one examination." R. 23 (citing Exhibit 13F/116 [R. 706]). In the August 2019 exam note cited by the ALJ, Dr. Poulson-Port vaguely mentioned the functional capacity evaluation findings, noting that Nelson "[h]ad a significant problem with sitting or standing for a long period of time." R. 706. The actual evaluation findings were much more specific. *See* R. 730. Kijakazi maintains that Dr. Poulson-

16

Port more fully described the evaluation findings later in his treatment note. That's true. In the "assessment and plan" portion of the same August 2019 exam note, Dr. Poulson-Port noted that the functional assessment showed that Nelson was "unable to tolerate sitting for very long without position change," was "unable to tolerate standing at all without position change," and needed to take standing breaks during the walking test. R. 709. But the ALJ never cited that portion of Dr. Poulson-Port's treatment notes in his decision. Thus, it's unclear whether the ALJ ever considered the specific findings of the functional capacity evaluation.

*Third*, the reasons the ALJ provided for determining that Dr. Poulson-Port's opinions had little persuasive value would not justify rejecting the findings of the functional capacity evaluation. The ALJ indicated that Dr. Poulson-Port's opinions were inconsistent with objective evidence showing reasonable physical function and improvement in symptoms with medication and were based on Nelson's subjective complaints. R. 23. In contrast, objective testing and Jansen's (the examining therapist) personal observations supported the sitting, standing, and walking limitations identified by the functional capacity evaluation. The objective evidence cited by the ALJ does not clearly outweigh the objective functional assessment. The ALJ also indicated that Dr. Poulson-Port's opinion that Nelson could sit or stand for only a few minutes was inconsistent with Nelson's function report, where she claimed she could sit for thirty minutes, stand for ten to fifteen minutes, and walk for ten to fifteen minutes *without a break*. R. 23 (citing Exhibit 5E [R. 242–54]). However, the functional capacity evaluation does not suffer that flaw—Jansen assessed Nelson's ability to sit, stand, and walk *throughout an entire workday*. Kijakazi has not identified any other significant evidence inconsistent with the functional capacity evaluation findings.

17

*Finally*, the ALJ's assessed RFC does not clearly accommodate the evaluation's findings. The ALJ determined that Nelson retained the capacity to perform sedentary work if, among other things, she was allowed to change positions between sitting and standing every twenty minutes, for a few minutes, before returning to sitting or standing. However, Jansen observed that Nelson had "near constant" movement and positional changes during the sitting and standing tests. That observation suggests that Nelson would need to change positions more frequently than every twenty minutes. And it's unclear if Nelson could perform the jobs identified by the ALJ at steps four and five if she needed to be allowed to change positions at will. Moreover, the evaluation's findings—that Nelson could tolerate sitting up to one-third of the workday, could tolerate standing less than one-third of the workday, and could tolerate walking up to one-third of the workday—are inconsistent with the combined sitting, standing, and walking demands of full-time work. In other words, if Nelson has great difficulty *both* sitting *and* standing, a sit-stand option does not really address that problem.

In sum, the ALJ's failure to explicitly assess the findings of the functional capacity evaluation was not harmless. Objective medical evidence supported the evaluation's findings, the other medical evidence in the record did not clearly contradict the evaluation's findings, and the ALJ's assessed RFC did not accommodate the functional limitations identified in the evaluation. Thus, remand is necessary.

## CONCLUSION

For all the foregoing reasons, I find that the ALJ committed reversible error in not addressing the findings of the July 2019 functional capacity evaluation. Thus, I **REVERSE** the Social Security Commissioner's final decision and **REMAND** this action to the Commissioner pursuant to sentence four of section 205(g) of the Social Security Act, 42

18

Case 1:20-cv-01878-SCD   Filed 03/16/22   Page 18 of 19   Document 37

U.S.C. § 405(g), for further proceedings consistent with this decision. On remand, the Commissioner should also address Nelson's other claimed errors regarding her headaches, the hypothetical posed to the vocational expert, her mental limitations, and her subjective allegations of disabling symptoms and limitations. The clerk of court shall enter judgment accordingly.

**SO ORDERED** this 16th day of March, 2022.

_____
STEPHEN C. DRIES
United States Magistrate Judge